Now at this time, we will hear United Food and Commercial Worker. Good morning, Your Honors. May it please the Court, my name is Steve Shadowin on behalf of the plaintiffs. The District Court here dismissed our complaint on the ground that we failed to plausibly allege that an entry barrier caused delay in generic entry. That conclusion flew in the face of the facts that were clearly alleged in the complaint. The facts alleged in the complaint are these, that the defendant's unlawful conduct erected an entry barrier of 180 days statutorily. A 180 day entry barrier. That's fact number one. Fact number two, that on day 181, the very day after the entry barrier that was wrongfully erected expired, in fact, seven generic manufacturers entered the market. Not in the but-for world, as the antitrust economists and lawyers like to say. In the actual world, in the real world, seven generic manufacturers entered the market on day 181. And they entered the market despite the fact that Takeda had sued them for contributory infringement of some other patents. They entered the market despite the fact that they needed FDA approval. They overcame the litigation. They got FDA approval, and they entered the market on day 181. The way they entered the market was that they settled their contributory infringement litigation, and they got a license from Takeda that allowed them to enter. It was that simple. And we say it's not just a plausible inference, it's a compelling inference that when there's an entry barrier of 180 days, and in the real world you get generic entry by seven manufacturers on day 181, the natural, plausible, compelling inference is, absent that 180 day entry barrier, that generic entry that occurred on day 181 would have occurred earlier. Your adversary says that the FDA's orange book, and correct me if I'm misunderstanding the record, but never reflected these supposedly misleading patent descriptions, but simply listed these two patents at issue as method patents, and that the complaint doesn't say that you obtained access to an underlying patent description. So I guess I'm stumbling at the first on the issue of causation. Sure. The complaint alleges that the delayed entry, quote, resulted from the unlawful patent descriptions. Okay? The other side says, well, those descriptions never made their way into the orange book. We're not in the public record. Well, I didn't, correct me if I'm wrong, because I think this bears on the issue, and I just want to make sure I have the facts. There was one company, Teva, that filed a Section 8 statement, as it were. Right. So they, at that point, thought there was no – that the patents at issue here were not a bar. The – or maybe they didn't know about whatever. The FDA then says, prompted by a complaint from one of the – from the manufacturer, oh, no. You've got to file a – Paragraph 4. Paragraph 4, thank you. And we won't evaluate the scope of these patents. Do I have that right? Almost. What the FDA said was there was a citizen's petition filed by Sandoz, a competitor, and what the FDA said was, okay, Teva, you tried to enter the market by doing only a Section 8 statement, but we are going to make you file a Paragraph 4. And here's the critical part. The reason we're going to make you file a Paragraph 4 is because of the way Takeda described its patents. So it doesn't matter whether Teva or any of the later generics knew about the misdescription because the FDA relied on the misdescription to prevent an earlier marketing of the generic drug. That's exactly right, and that's why we described the causation in the complaint the way we did. We said it resulted from the unlawful descriptions, and it resulted from it in two ways. Number one, the way you just described, that is, regardless of who knew what, the FDA was not going to allow anyone to make just Section 8 statements. That's not just a speculation, but it actually occurred. That's what actually occurred. And, Judge Livingston, to get back to your point, there is a regulation, and we quote it in our reply brief, page 8 to 9, and the FDA knew about, obviously, this glitch in the Orange Book, and the regulation applicable at the time, I'll quote it, the patent information submitted to FDA, that is, the description, how they described their patents, whether or not published in the Orange Book should be the basis of the applicant's certification. So, obviously, the plausible inference is there's some way to find out, because the FDA makes you find out, regardless of what's in the Orange Book. And the details of it are not in our complaint, and you've seen the back and forth in the briefing about, well, there's FOIA requests. Well, no, there's not FOIA requests. These generic manufacturers are in the business of bringing drugs to the market, and they find out things. In fact, there are commercial entities that do the FOIA requests, and the generic manufacturers subscribe to them. They get all the information. So, with respect. You're assuming that a generic cannot essentially bring suit to force the patent holder to correct or delete patent information that is contained in its filing? I don't think I'm assuming that at all, Your Honor. I don't. Well, I mean, if they can, then the whole system really accommodates the, well, first of all, there would be no reason to commit a fraud like that. The other is the whole system under Patch Waxman accommodates this kind of back and forth and this kind of litigation that's designed to resolve these kinds of disputes. There was a way for the generic manufacturers, and Teva did it, to bring a counterclaim to delist the patent or to correct the information that they had submitted. Right. And how did that work out for them? Well, that worked out in that they settled the lawsuit for a particular entry date. And that's part of, if we get in, when we get into this in the district court about causation, that will be one of our theories is that the reason that, one of the reasons that Takeda was willing to settle this case, think about what they did. They settled with seven generic manufacturers for entry on the day after the entry barrier, the automatic entry barrier, expired. Takeda had no faith whatsoever that they were going to be able to prevent these generics through litigation or in the delisting litigation or any other way. Takeda voted with its feet as to what it thought of its chances in that litigation. They gave it zero weight. They didn't use the leverage of those litigations to get delay beyond one day beyond the statutory automatic date. So the fact that generic entry occurred on day 181 tells you everything you need to know, especially on a motion to dismiss the complaint, on an intensely factual issue such as causation. But if the issue had been pressed in court as is permitted under statute law, there could have been a determination months or years earlier that the patent information was wrong and should be deleted. There could have been, and that's why they settled for the date that they did. The point is the generics— Well, I'm trying to know why we need the antitrust laws as an overlay to all of this. I see your point. It's a conceptual thing. I don't think there's any law, Your Honor, that the fact that there's a potential administrative or litigation remedy for competitors to avail themselves of, that does not negate in any way the ability for private litigants who paid the freight who were injured. It doesn't negate it, but it raises some question as to whether you're an efficient enforcer of the antitrust laws, especially since you represent people who are indirect purchasers. And the people who have the greatest interest in fighting this out have a system, a very detailed system, a ramified system set out under Hatch-Waksman for how to assert their interests, which are the same as the direct purchasers and which is in a diluted form the same as the indirect purchasers. We're here on a motion to dismiss the complaint, and that is not an argument that was even raised by Takeda with respect. If we needed to litigate whether we're efficient enforcers, there's a mountain of case law that says we're the most efficient enforcers because we're the ones who pay the inflated prices that result from this kind of conduct. Thank you. Could you just address briefly the effect of a citizen petition that was filed in 2007 on the carve-outs on causality? Certainly, Your Honor. Takeda acts as if we needed to plead or even ultimately to prove that the generics would have overcome that citizen petition. We don't need to do that. In the actual world, the seven generic manufacturers that entered on day 181 did not have carved-out labels, so they had nothing to do with that citizen's petition. They entered without carved-out labels. How did they do that? They got a license from Takeda, and one of the ways we have when we get into this, we'll have three or four different pathways that generics could have entered earlier, but one of which will be the easiest. They simply took what happened in the real world. They settled the litigation for day 181 and say without the unlawful leverage that that 180-day entry barrier gave to Takeda, they would have agreed to day 179 at least. And at that point, our burden on causation is done. But the point is that when there's an entry barrier like this and the generic entry in fact occurs in the real world on the day after that entry barrier comes down, it's certainly plausible on a motion to dismiss the complaint that entry would have occurred earlier. All the nitty-gritty details of how that could have occurred, that all happens later. By the way, when it does happen later, we say the burden of proof is going to be on the defendants. They're arguing, they acknowledge in their brief on page 45 of 46 that all the other potential causes of the delay are what they call independent causes or separate causes in the law, intervening causes, and the law is crystal clear in this circuit and everywhere else. The burden of proof on intervening causes is on the defendant. Thank you, Your Honor. Thank you. You reserve the room by the line while he will hear the answer. Good morning, Your Honors. Rohit Singlap for Takeda Pharmaceuticals. I'd like to start with the issue of causation, which we were just discussing, but then I'd like to also discuss the question of liability. In other words, has there been a showing of anti-competitive conduct? Has there been a showing or an allegation that Takeda's listing was wrongful or anti-competitive? Starting with causation. So it's clear that alleging causation is an essential element of a plaintiff's claim, excuse me, an antitrust plaintiff's claim. Here, the only allegations in their complaint are paragraphs 104 and 139, and I would encourage the court to read those paragraphs. There is no way we submit for an allegation to be more conclusory than those two paragraphs. All they say is literally, without Takeda's patent descriptions, which they think were erroneous, there would have been entry in 2011. That's all they say. All the theories that we have heard now on appeal and from counsel on appeal, FOIA requests, there would have been a different license, that something different would have happened with the citizen's petition, that there might have been approval for section 8 carve-outs, all of these things. I understand their causation argument to be, and I can't claim a perfect understanding, but I believe what they're saying is that if Takeda had not listed Actos as a patented thing in a new drug product listing together with metformin and a secretion enhancer, and instead had treated this simply as a method of use, that it could have preserved its patent for the use of Actos with metformin and with the secretion enhancer, and the generics would have been able to file under Title 8 and say what we want is we want to be able to do a generic that doesn't have metformin, that doesn't have the secretion enhancer, but that they couldn't because of the mechanisms of which your client is surely aware. So, Your Honor, the question, though, is where is any of the allegations for how that would have happened in the complaint? Where in the complaint do they allege that the patent descriptions caused a delay in generic? So for that theory to make sense, to be able to allege that theory, first you have to say that the generic... Does that theory make sense? It does not. Let me explain why not. So the first is you have to assert that the generic companies knew about the patent descriptions, and as is undisputed, these were not in the Orange Book. So all of the generic companies, except for Teva... I raised this before. I'm not understanding why it would be necessary. It may be a fair inference from the settlements that were reached, but assuming, putting them aside, why do they have to know? If the FDA, nevertheless, relies on the allegedly false claims to prevent, as they did in Teva, a different earlier approach, why isn't that sufficient causation? Because the FDA didn't do anything about that until 2010. So Teva did not file a Paragraph 4 certification. It's one of the few generic companies that chose not to. Seven generic companies filed Paragraph 4. What happened there shows what would have happened if the others had. I don't think so, Your Honor, because Teva received tentative approval without a Paragraph 4 certification. Until 2010, the FDA did not require Teva to have a Paragraph 4 certification. Teva filed an application, got tentative approval, and went all the way through 2010 without a Paragraph 4 certification. The FDA never said to Teva, You have to put in a Paragraph 4 certification because Takeda has these patent descriptions, until 2010. And what the plaintiffs have never alleged is a clear step-by-step theory of exactly how the patent descriptions led to delay. So let's say, in 2010, Teva is told by the FDA that they have to put in a Paragraph 4 certification at that point. That's what happened. And the Paragraph 4 certifications, let's say, were caused by, at that point, Takeda's improper description. Let's just assume that for a moment. Okay, so what? At that point, what allegation is there on the complaint that Teva would otherwise have been able to come to market by 2011? We're talking about 2010 at this point. They still have to get approval for Section 8 carve-out, final approval. And as Judge Livingston pointed out, by this time, Takeda had objected to such Section 8 carve-outs. Do you think this can be decided on a motion to dismiss? Absolutely, Your Honor. How long it takes for the FDA to approve a generic that is identical? I don't know how long it is, but I would hate to think it's all that long. It can be quite a long time, Your Honor. After Takeda filed that citizen's petition in 2007, there were no further approvals of Section 8 carve-outs. And to this day, there has never been an approval for a Section 8 carve-out for Actos. But the important point, Judge Jacobs, is it has to be alleged. We can decide these things. What we're deciding is not whether the plaintiffs are right. What we're deciding is whether the plaintiffs alleged after three complaints. So, in just in that regard, and I may have missed this in the record, the dismissal was with prejudice. Yes, Your Honor. But did the issue ever come up of whether, instead, it should have been without prejudice with leave to amend? No, Your Honor. So the plaintiffs filed a complaint. They amended their complaint. We then filed a motion to dismiss, a lengthy motion to dismiss. They filed a new amended complaint at that point. So you're telling me that the arguments about their failure to adequately plead causality were raised before they filed the complaint that Judge Abrams acted on?  And they never moved for leave to amend, and they have never argued to this court. They've never argued to this court that Judge Abrams erred in not giving them leave to amend. So when the court is evaluating all of these theories, you have to look at what's actually in the complaint, and the complaint has none of them. Nothing is in the complaint about causation, and that was the basis for Judge Abrams' decision. And to reverse Judge Abrams, based on theories being concocted now on appeal, theories, very frankly, that if they had been in the complaint, we would have taken them apart step by step because they don't make sense. But we never had that opportunity because they were never alleged. With that, I'd like to turn to liability, which was not addressed. It's very important. Are you saying that theory of causation that I inarticulately sought to set out is not alleged in the complaint? It is alleged in a sentence. It is alleged in the most conclusory fashion, which just says, without patent descriptions, there would have been earlier entry. No explanation of what would have happened to the patent litigation. Would it not have settled? Would the generics have won? What would have happened to that patent litigation? How would the FDA, and when would the FDA, have approved Section 8 carve-outs? How did anybody know about what was not in the Orange Book? None of those facts are alleged. There's just a sentence that says, we were harmed. I mean, if the whole point of Duval— Would you concede, would you not, that filing a drug product description that includes a drug that is about to come off patent and doing it as a compound with other things, but filing that as a drug product rather than a method of use, which can then be steered around by applying for certain uses rather than others, which is Section 8, that that can cause delay? If the plaintiffs can allege delay, it is possible. It is theoretically possible. But it can cause delay. Theoretically, it can. Of course. Theoretically, it could cause delay. But to actually show delay in this case— Remember, there's an 11-year gap between the patent descriptions and the supposedly delayed entry. You'd have to show step by step how was there delay. But if the court will oblige me, I would like to talk about the liability standard, because there's been an assumption in this discussion that Takeda's patent listing was improper, which is just not true. So let me start with the listing standard, which is there's no dispute that the patent here should have been listed. They concede the patent should have been listed. The question is whether the patent— No, but they concede it should have been listed as part of a method of use. And not as a product claim. Yeah. They're saying that Takeda's product claim contention should meet the listing standard. So let's just talk about that. The listing standard says that the patent must be listed if it claims the drug and a reasonable claim of infringement can be brought. Now, the question is how do you interpret that language? And we submit the plaintiffs have not identified for this court a single case, a single FDA regulation, a single precedent, in which anybody has ever interpreted that language differently than what Takeda interpreted. Takeda interpreted that language to basically mean a patent, or in this case a patent claim, must be listed if it could reasonably be infringed. And there's no dispute that Takeda's patent claims at issue here, the ones they're complaining about, could be infringed, and in fact probably would be infringed by someone selling Actos. There's just no dispute about that. That is conceded in their brief at pages 48 and 49 of their opening brief. So then the only question is they say, look, because you are claiming a combination, you shouldn't have listed it in the orange book as a product claim. But there's no law that says that. If you look at the actual cases cited in our TAN brief. What would you have lost in terms of your intellectual property if you had listed this as a method of use? We would be violating FDA law, Your Honor. We would be violating a statute set up by Congress, which mandates that these things have to be listed. It would be listed. You would have a method of use. And there it would be, this and that. Judge Jacobs, the FDA says that we must specify the claims and what kinds of patents there are. And if there are product claims, we have an obligation, a legal obligation, to say they're product claims. This is not something, this is a misconception I think sometimes, this is not something that branded companies have a choice about. We don't have a choice, should we list a claim or should we not list a patent? Should we list a patent or not? There are cases in which branded companies have been held liable for not listing patents. The NDA, the drug application, can be denied by the FDA if you don't list your patent. Because generic companies want patents to be listed. So the standard for listing, Your Honor, we cite the AAI Pharma case from the Fourth Circuit. It says the standard for listing a patent is would it be infringed? Clearly, our patent and the claims we're talking about here meet that standard. We cite the Teva case from the D.C. Circuit, in which the D.C. Circuit said the standard for listing is the patent holder looks to substantive patent law. If that is so, then what would the method of use filing be? Because presumably it would be a method of using an existing patent. So you would have to list the patent and the method of use. Your Honor, it sounds like you could do that here or there or the other place. Your Honor, let me back up one second. Let me make sure there's not any misunderstanding. There could easily be. Okay, if you don't mind. Go ahead. Let me just back up one step here. So Takeda had patents, two patents, and those patents had method of use claims. In other words, there were numbered paragraphs at the end of the patent that specified methods of using pioglitazone, what's in Actos, with, for example, metformin. Those clearly had to be listed, and there's no dispute it should have been described as method of use claims. So that's not disputed. Then those patents also had claims, and this is allowed under patent law. It's a perfectly standard way to get patents, that didn't claim a method of use. They claimed the combination of pioglitazone with metformin. And the question is, should those claims, claims that claim pioglitazone with metformin, should those claims have been in the Orange Book, or should have been described as product claims claiming the drug? That's the question. And the answer to that question is, yes, they should have been, because the standard for putting a patent, the mandatory requirement for putting a patent in the Orange Book and describing it to the FDA, is whether that patent would be reasonably infringed by someone trying to sell the branded company's own drug. Here's Actos. So if you look at AAI Pharma, if you look at the Teva case, in these cases, the courts of appeal have held that what the patent holder needs to do is determine, look, if your patent could reasonably be infringed by someone selling your drug, you have to list the patent. That's exactly what Takeda did here, and I will point out. And you have to list the patent under the scheme so that the generics have an opportunity to get you into court and to take advantage of the 30-month stay and the first filer option. Exactly. I mean, what I think sometimes gets missed here is this whole system was set up not to benefit Takeda necessarily. It was set up mostly to benefit the generic companies. The generic companies want Paragraph IV certifications. They want litigation in court before they come to market. It's a huge advantage to them because then they don't have to risk massive damages. And the industry treats it this way, Your Honor. So all those generic companies who file Paragraph IV certifications to Takeda's patents without the orange book saying there was a product claim, why did they do that? Plaintiffs have no explanation. Why did they do that? They did that because the industry understands the law the way Takeda does. If a patent claim could be reasonably infringed by someone selling Actos, it's got to be in the orange book. There's got to be a Paragraph IV certification. That's why all those generic companies did that. Judge Rakoff raised the citizen's petition that was filed against Teva by Sandoz. Sandoz is a generic company, not Takeda, not a branded company. It's a generic company. Sandoz, a generic company, came forward and this is a matter of public record. The court can look it up. Sandoz came forward and said to the FDA, wait a minute. Takeda's patents have these product claims, and those product claims are being asserted in litigation against all of the generic companies before Judge Cote here in the Southern District. Teva has to make Paragraph IV certifications because those claims could reasonably and are being asserted. So therefore, Teva has to make Paragraph IV certifications. In other words, Sandoz is reading the law exactly the way Takeda has been reading the law. The plaintiff's reading of the law that says that you only list a claim if, I don't know what they're saying exactly, if the exact formulation of the drug is in the claim of the patent, is that what they're saying? That's not the law. Everybody knows that's not the law. The industry doesn't work that way. And I can give the court many examples. Let me give you one example. So the drug here, Actos, has puglitazone and has many other ingredients in it. It's not just pure puglitazone, right? It's a pill. It has all kinds of things in it, right? There are patents that claim a formulation. These are called formulation patents. The court may be familiar with the Actavis litigation that went up to the Supreme Court, cited in the briefs. I was involved in that. I'm involved in that case. In that case, there's a formulation patent. The whole formula, the recipe. In our case, for example, the Takeda 777 patent, which was the main patent, expired in January 2011, they don't challenge that patent. That doesn't claim the whole formula for Actos. It just claims an ingredient. It doesn't claim the whole drug. It claims one ingredient, a critical ingredient in the drug. Everyone agrees it should be listed because, of course, if someone sells Actos, they're going to infringe that patent. So it needs to be listed. In the same way, anybody trying to sell Actos would infringe these two product claims patents that we're disputing about now that have combination claims because, under the law of inducement, the substantive patent law of inducement, there would be a reasonable claim for infringement. The last point I'd like to make, if I could, Your Honor, is that even if this court disagrees with the Fourth Circuit and the D.C. Circuit and Sandoz and Takeda and how the industry understands the listing statute to work, there still should not be liability. Let's put aside causation even for a second. There still should not be liability. There should not be liability, Your Honor, because the most important element of an antitrust monopolization claim is anticompetitive conduct. In the Adderall case, this court defined anticompetitive conduct as conduct without a legitimate business purpose. Conduct without a legitimate business purpose. If Takeda was trying to abide by FDA regulations and the Hatch-Waxman Act and Congress's mandatory listing of patents, if Takeda was trying reasonably to follow that law, there can't be liability because there's no anticompetitive conduct. Takeda's conduct, then, is not conduct without a legitimate business purpose. The fact that Takeda, maybe this court would say got it wrong 20 years later or 16 years later, say that Takeda misinterpreted a statute, that can't be a basis for treble damages antitrust liability. We cite the Areta Treatise at paragraph 246, which makes this clear. And I would say there is no case in the record, no case cited, no case I am aware of in 100 years of antitrust in which a company has been held liable in treble damages for trying to meet what seems to be a reasonable interpretation of a mandatory government regulation. Thank you, Your Honor. Please set the rebuttal time at five minutes. There's a lot here. Thank you. Thank you, Your Honor. Very quickly, counsel identified for the court his version of where our allegations of causation are. Let me— I just looked at that, and if it's just limited to paragraphs 104 and 139 of the amended complaint, I think he has a point. Is there something else that you want me to look at? Very definitely. Paragraph 119, paragraph 120, paragraph 122, paragraph 118. Those are the allegations where we say that's what distinguishes this case from all sorts of cases where you have to theorize how somebody would have been able to enter the market. We didn't have to do that in this case. We had seven generics who, in fact, entered. There is a lot of case law. For example, the Andrex v. Bileville case in the District of Columbia Circuit where there was a question on a motion to dismiss. It was a generic who was delayed, and the question was what all did that generic have to allege in order to— and it was a 180-day exclusivity also case. How much did they have to allege that they would have been able to enter the market? What the court said was—and that was a company that had not yet entered because the unlawful conduct was ongoing. The court said it wasn't enough for the generic manufacturer to say that they had filed an ANDA. Here's what else they had to do. They had to also allege that they were trying to enter the market and that it was probable that they would get FDA approval. But you say—I mean, I'm looking, for example, at paragraph 122, one of the ones you just mentioned, and you describe the cases that were brought in the previous paragraphs, and you say, quote, All of these potential competitors agreed to delay entry into the market until 180 days after Mylan, Rambaxi, and Activis entered. Absent the bottleneck created by Takeda's improper listing of patent information with respect to the 584 patent and the 404 patent and Takeda's subsequent execution of exclusion payment agreements with Mylan, Rambaxi, and Activis, many or most of these later ANDA filers would have entered the market much sooner than they did. Doesn't that presuppose, going back to the very first question that Judge Livingston put to you, that they had knowledge of what you allege is the improper filing with the FDA of the two patents and the misdescription of those patents in your words? Isn't that implicit in what you're saying here? Is your theory of causation? It is one of two ways that the patent descriptions directly cause. One, we've already talked about, is that regardless of how – Yeah, I'm putting that aside for a second because I'm looking at your language here. Right. And it does seem to – and that was also true of 104 and 139, the two paragraphs mentioned by your adversary, which I just looked at. They all seem to presuppose that we know that these other companies would have entered the market sooner but for the problem created, but we don't – but that presupposes that they knew that there had been such a submission to the FDA with respect to those two patents, doesn't it? That specific allegation may be read that way, but there's – I can't find it at the moment. It's cited and quoted in our brief. There's a more general allegation that the need for them to make paragraph 4 certifications, quote, resulted from, close quote, the false descriptions. Is there anything in the complaint where you say, notwithstanding when it was enlisted in the place of the Orange Book or the – Orange Book. There's every reason to believe that they knew about it because, or anything like that. We don't go to that level of detail. There's a general allegation that the need to make a paragraph 4 certification resulted from the false descriptions, and it resulted from, I'm sorry, it resulted from because there's – and I read it earlier, and we quoted in our brief a FDA regulation that says that the patent – the generics patent certification must be based on the information that, in fact, the description that, in fact, Takeda gave to the FDA notwithstanding the fact that it's not in the Orange Book. And in the FDA's ruling on the Sandell Citizens petition, they addressed that again, and we incorporate that by reference into our complaint. That is, they say in that ruling – But the argument is, if I understand this first, that whatever theories you're now expressing here, none of that was alleged in any but the most conclusory form in the complaint. Number two, that you don't suggest any plausible reason to believe that these folks would have filed earlier based on the incorrect information given to the FDA as opposed to their theory that either they didn't know at all or, if they did know, they read it the same way the manufacturer read it that Takeda did and, therefore, didn't think there was anything they could do about it. And none of that is dealt with in the complaint as far as I'm concerned. Well, and the FDA's – I want to be absolutely clear because this would have huge public policy and competition policy implications if you were to accept their version of how – but the FDA dealt with that directly and specifically in the ruling on the Sandell Citizens petition. They said that the reason that TEVA had to make a Paragraph 4 certification was not because there was some product claimed, some other product in the patent, which is what they're saying. They specifically said the reason TEVA has to make the certification is because of the way that Takeda described the patent as claiming Actos. That's specifically the basis for the FDA's ruling. But it would seem, based on your exchange with Judge Rakoff, that the other generics seem to have assumed that Takeda would list its patents in the way that it did. And if that is so, it does suggest that that's what the industry does. And if that is so, it suggests that it's probably legal. Not at all. And let me make one thing clear. They've changed course here. In their brief, they acknowledge that absent the patent description, that the generics incentives, all except for the first filers possibly, every one of the generics incentives would have been to make only Section 8 statements. And the Supreme Court in the Karakal decision talks about why. The question is why didn't they? And if they didn't do it without actually knowing what was listed, it could be because they assumed what was listed. And they assumed what was listed is because they assumed that that's what had to be listed. We think that the FDA regulation that says that the generics have to make their certifications based on what is actually what the description that Takeda actually makes easily gets us over the plausibility standard. That if that's the regulation, there must be some way for them to find out, right? The FDA is not going to have a regulation that says, even though it's not in the orange book, you have to make a certification based on what they actually said. They're not going to have a regulation like that and then not have a means for the generics to actually find out. But I'm going to take a step back. We're way in the weeds now beyond a motion what needs to be in a complaint in an antitrust case. The fact of the matter is that seven generic manufacturers entered on day 181. That distinguishes this case from any other kind of case where you want to try to dream up other intervening causes or whatever. But let me, if I may have one moment because it's exceedingly important on the question of whether the listing was false. The other side relies upon the AAI decision in the Fourth Circuit. It's a footnote in the AAI decision, and you should read that footnote because they excised most of it. What they rely on is preceded by this. The Court of Appeals says it's not really important, the details of it, but the gist is, and then they cite the stuff that they rely on. The Teva decision that they rely on doesn't address that at all. There is a case from the Federal Circuit directly on point on this that says a patent does not claim the drug product merely because the patent can be infringed. It specifically says that. That's what the statute seems to say. No, not at all. The statute says the opposite. The statute says in order to list, it must claim the drug product and be capable of a reasonable claim of infringement. If what they say is true, that all that matters is infringement, they've just read out half of the statute. The statute says you have to meet two criteria. It has to claim the drug product, and you'd have a reasonable claim of infringement. The Hearst case directly on point. Thank you both. It's been expertly argued. We will reserve decision. Crowell v. Colvin were taking that case on submission. United States v. Smith taking on submission. Vail v. United States taking on submission. That's the last case on calendar. Mr. Conday, please adjourn court. Court stands adjourned.